**A F F I D A V I T**

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to-wit:

I, Sean McNees, being first duly sworn, do hereby depose and state as follows:

**INTRODUCTION**

1.   I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since January 2016. I am currently assigned to the ATF Louisville Field Division, Charleston, West Virginia, Field Office.

2.   I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a silver in color Celero 5G cellular telephone, more fully described in Attachment "A," and the extraction from that property of electronically stored information described in Attachment "B."

3.   The contents of Attachment "A" and Attachment "B" to this Affidavit and application for a search warrant are hereby incorporated by reference.

4.   The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

5.   Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for this warrant.

**STATUTORY AUTHORITY**

6.   This investigation concerns an alleged violation of 18 U.S.C. § 922 (g)(1) – Felon in Possession of Firearms and Ammunition.

**AFFIANT'S TRAINING AND EXPERIENCE**

7.   I graduated from the Federal Law Enforcement Training Center, where I learned basic criminal investigation techniques. In addition, I graduated from the ATF National Academy, where I learned about federal firearms laws, federal explosives laws, bomb scene investigations, and arson investigations.

8.   I have received investigative training, conducted and participated in investigations of violations of federal criminal laws, including those relating to firearms and controlled substances. These acts commonly involve the criminal use and transfer of firearms, illicit drug trafficking, acts of arson, or criminal possession or use of explosives and/or destructive devices.

9.   In my current position as an ATF Special Agent assigned to the Charleston, West Vrginia Field Office, my primary

responsibilities include investigating individuals or groups who have committed violations of the federal firearms and narcotics laws. Within that role, my job duties include, but are not limited to:

a. Functioning as a case agent, which entails the supervision of specific investigations;

b. Interviewing witnesses relative to the illegal trafficking of drugs and firearms and the distribution of monies and assets derived from these illegal acts;

c. Functioning as a surveillance agent observing and recording movements of persons trafficking in drugs and firearms and those suspected of trafficking in drugs and firearms; and

d. Drafting, obtaining, and executing search warrants.

## AFFIANT'S KNOWLEDGE OF CELLULAR TELEPHONES AND THEIR USE IN CRIMINAL ACTIVITY

10. I am personally, and professionally, familiar with cellular telephones or mobile telephones.

11. I know that a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communications between parties in remote locations.

12. I am aware that cellular telephones usually include a "call log," which records the telephone number, date, and time of calls made to and from the phone.

3

13. In addition to enabling voice communications, I know that cellular telephones now offer a broad range of functions, which include, but are not limited to: storing names and phone numbers in electronic address books or contact lists; sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; accessing and downloading information from the internet; and sending, receiving, and storing GPS coordinates of a phone's location. Cellular telephones can also be utilized to access social media and mobile banking or financial applications, such as Facebook, Instagram, Cash App, Zelle, and Venmo.

14. Based on my knowledge, training, and experience, I know that cellular telephones, such as the Celero cellular telephone described in Attachment "A," can store electronic information for long periods of time.

15. In my experience, it is common for cell phones possessed by individuals who illegally possess firearms to contain evidence including call logs, text messages, stored emails, contact lists, photographs and video images of firearms and firearm proceeds, and other information. It is also common for individuals to utilize cell phones to sell or obtain firearms.

4

16. I also know from my training and experience that the electronic memories of cell phones, including social media and mobile banking or financial applications, have been found to contain evidence of illegal firearm possession, including communications regarding when and how an illegal firearm was obtained, who obtained the illegal firearm for the possessor, the motivation for possessing the illegal firearm, and payment for the illegal firearm. Generally, historical data regarding the prior possession of firearms, including voice messages, text messages, and contact information will be stored in the cellular telephone.

17. I also know that people who sell or possess firearms illegally frequently take or cause to be taken photographs or other images of themselves in possession of firearms, their associates, and their property and assets with cell phones. They also frequently utilize cell phones to communicate with others they have conspired with as well as with other individuals in order to purchase or sell firearms.

18. Cellular telephone capabilities sometimes include Global Positioning Systems (GPS), which calculates the device's geographical location by receiving information from GPS satellites. This includes GPS data associated with metadata in photograph and video files, and databases from applications that use GPS data in their operation. This location information can also come from cellular towers and wi-fi networks with which the

device has interacted. The records obtained from wireless network connections could give clues to a device's historical locations. By determining the physical location associated with the cell phone, investigators can understand the chronological and geographic context of the cell phone and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of the cell phone's access and use, and events relating to the crime under investigation.

**PROBABLE CAUSE**

19. On July 24, 2024, I was contacted by West Virginia Department of Corrections Parole Officer (PO) Russell Nuckles, who advised that he and other Parole Officers were currently searching the residence of Jason RHULE (hereinafter RHULE) located at 818 Washington Street West, Charleston, Kanawha County, West Virginia 25302, under the conditions of RHULE's parole. During the search, two (2) firearms were located in RHULE's bedroom.

20. PO Nuckles later provided me a report that detailed the search and interaction with RHULE. According to the report, at approximately 7:30 PM on July 24, 2024, officers arrived at RHULE's residence and were let inside by RHULE's mother, who stated that she did not know if RHULE was home or not. Officers called out to RHULE but did not receive a response.

**21.** Officers then went to RHULE's bedroom, located on the second floor of the residence. RHULE was located in his bedroom and was sitting on his bed by himself. He was called out of the bedroom and detained. PO Nuckles and PO Bryan Thompson then searched RHULE's bedroom. A Palmetto State Armory, model PA-15, multi-caliber (7.62) rifle was leaning up against the wall next to the bed. The rifle had a round in the chamber and loaded magazine inserted. A loaded Taurus, model PT140 G2 A, .40-caliber pistol was located on the bed that RHULE had been seated on when first observed by officers. In addition to the two (2) firearms, multiple loaded firearm magazines were located on the floor around the bed. An ammunition box with numerous rounds of 7.62 caliber ammunition was located in a bedroom across the hall from RHULE's bedroom.

**22.** The POs also found the Celero cellular telephone described in Attachment "A" on top of a dresser in RHULE's bedroom. The cell phone was seized during the search.

**23.** At the conclusion of the search, Charleston Police Department (CPD) Officer Anthony Thomas took photographs of the seized items inside of RHULE's bedroom. Officer Thomas then took possession of all the seized items and brought them to the CPD Special Enforcement Unit (SEU) office, where they were secured overnight. On July 25, 2024, I then took possession of the property from CPD Officer Opie Smith.

7

**24.** Based upon the firearms and ammunition located in RHULE's possession, he was taken into custody at that time for violating the terms and conditions of his parole. RHULE was also found to have an unrelated outstanding warrant for his arrest through Kanawha County, West Virginia. RHULE was transported to South Central Regional Jail in South Charleston, Kanawha County, West Virginia.

**25.** I obtained a copy of RHULE's parole services rules and regulations paperwork. Under section "Q," RHULE was notified that he would have to submit to "a search without a warrant of my person, residence, or motor vehicle by my officer at any time during my supervision." RHULE was also notified that as a convicted felon, he was prohibited from possessing firearms. RHULE signed the paperwork and listed his address as 818 Washington Street West, Charleston, Kanawha County, West Virginia 25302.

**26.** On July 29, 2024, I obtained from South Central Regional Jail the recorded phone calls RHULE had made since his arrest. Eleven (11) recorded calls were located and were all made to the same phone number, 304-550-8897. The calls were made between July 26, 2024, and July 28, 2024. From prior investigations, I knew that it was common for inmates to also utilize a pin number belonging to another inmate to make phone calls. Based upon this, I also requested any recorded phone calls made from any inmate to phone number 304-550-8897 since the time of RHULE's arrest. Two

(2) additional recorded calls were located. The calls were made on July 25, 2024, and July 26, 2024. The phone number dialed in each call (304-550-8897) was believed to be associated with RHULE and his mother, as it was listed on RHULE's Probation and Parole Supervision Report dated April 5, 2024.

**27.** On July 25, 2024, RHULE utilized another inmate's pin number to call phone number 304-550-8897. During the call, RHULE was talking to his mother. RHULE instructed his mother, "You're going to have to tell them that those were yours." RHULE's mother responded, "Oh, so you want me to go to jail." RHULE said, "Mother, it's only a misdemeanor," but his mother told him that it wasn't a misdemeanor. RHULE then said he would have to do fifteen (15) or twenty (20) years over it. RHULE's mother advised him that RHULE's phone had been taken, and without it, she was not able to look at her security cameras. Based on my training and experience, I believe RHULE was trying to get his mother to tell law enforcement that the guns found in his room belonged to her because he did not want to go to prison for fifteen (15) or twenty (20) years.

**28.** On July 26, 2024, RHULE again utilized the pin number of another inmate to call phone number 304-550-8897 and talk to his mother. RHULE's mother told him that she did not know the passcode to his Cash App. RHULE stated that nothing could be done with it because "they" had his phone. RHULE's mother advised that she had that "sucker" suspended. RHULE told her, "Okay, but they could

9

still get on it and see the messages and shit." RHULE's mother responded, "Yeah, then that's gonna kill you." Based on my training and experience, I believe that RHULE and his mother were discussing her efforts to prevent law enforcement from accessing inculpatory information relating to RHULE that was stored on the Celero cellular telephone identified in Attachment "A."

29. On August 2, 2024, I interviewed RHULE at South Central Regional Jail. RHULE entered the room and I identified myself as an ATF Agent. I explained that I was not there to talk to RHULE about anything that he had been currently charged with and only wanted to speak to him about the firearms located in his bedroom. I then verbally advised RHULE of his *Miranda* rights, which RHULE indicated that he understood. RHULE then confessed to possession of both firearms in his bedroom. RHULE also stated that he was a felon and knew that he was not supposed to have firearms. RHULE stated that he had traded someone a chainsaw for the "AR" but did not get a bill of sale when he did the trade. RHULE estimated that he obtained the rifle in May of 2024. RHULE stated that he utilized his cell phone to set up the trade through Facebook Marketplace.

### PRIOR FELONY CONVICTION

30. A review of RHULE's criminal history showed that he is prohibited from possessing firearms and ammunition, having previously been convicted on or about July 28, 2023, of the felony

offense of Attempt to Commit Grand Larceny in Kanawha County, West Virginia, among other felony offenses.

## CUSTODY OF THE CELLULAR TELEPHONE

**31.** The Celero cellular telephone described in Attachment "A" was seized by law enforcement from RHULE on July 24, 2024. Since the cellular telephone was seized, it has remained in law enforcement custody and is currently in the custody of the ATF Charleston, West Virginia Field Office, 300 Summers Street, Charleston, Kanawha County, West Virginia 25301.

**32.** In my training and experience, I know that the cellular telephone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the possession of ATF.

## NATURE OF THE EXAMINATION

**33.** Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

11

**34.** Because this warrant seeks only permission to examine the device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

**35.** Based on my training and experience, and the facts set forth above, I believe there is probable cause that evidence of criminal violations of 18 U.S.C. §922(g)(1) – Felon in Possession of a Firearms and Ammunition, will be found on the Celero cellular telephone described more completely in Attachment "A."

36. WHEREFORE, I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Celero cellular telephone described in Attachment "A" to seek the information described in Attachment "B."

Further your affiant sayeth naught.

Sean McNees, Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Sworn to by the affiant telephonically in accordance with the procedures of Rule 4.1 of the Federal Rules of Criminal Procedure this the 9th day of August, 2024.

Dwane L. Tinsley
United States Magistrate Judge